CLYDE C. JORDAN et al., Plaintiffs-Appellees, v. CARL E. OFFICER et al., Defendants (Carl E. Officer et al., Defendants-Appellants).

Fifth District No. 5—87—0421

Opinion filed June 13, 1988.

Jack A. Strellis, of Strellis & Faulbaum, of Waterloo, for appellant Charlotte Moore.

Kenwyn A. Redding, of Mann, Poger, Wittner & Hereford, P.C., of Belleville, for appellant Carl E. Officer.

Philip R. Rice, of Rice Law Offices, of Belleville, for appellees.

JUSTICE LEWIS delivered the opinion of the court:

This appeal arises out of the February 24, 1987, Democratic party primary election for candidates to run in the consolidated (general) election for city offices in the City of East St. Louis. In the primary election, Carl Officer defeated Clyde Jordan, Harold Franklin and Roosevelt Malone for the party nomination for mayor; Charlotte Moore defeated Charles Powell for the party nomination for city treasurer. The margin of victory was 1,035 votes for Officer over Jordan and 987 votes for Moore over Powell.

On May 9, 1987, Jordan and Powell petitioned the circuit court of St. Clair County contesting the primary election results, alleging a violation of section 7—43(c) of the Election Code (Ill. Rev. Stat. 1987, ch. 46, par. 7—43(c)) in that over 2,000 voters in the primary election had also signed nominating petitions for independent candidates, thus disqualifying those voters from participating in the primary. Plaintiffs,

Jordan and Powell, named Officer, Moore, Franklin and Malone as defendants. On March 25 the circuit court ordered the East St. Louis board of election commissioners to review nominating petitions filed by independent candidates to determine who among the persons signing those petitions also voted in the primary election.

On March 27 the board of election commissioners petitioned for permission to distribute absentee ballots for the consolidated election scheduled for April 7, 1987. The ballots named Officer and Moore as the Democratic candidates for the offices of mayor and treasurer, respectively. On April 2, 1987, while the board's review of nominating petitions was in progress, the circuit court on its own motion postponed the April 7, 1987, consolidated election, citing as reasons therefor the expense which would be wasted should the consolidated election proceed with improper names on the ballot and the physical impossibility of holding the election as scheduled. Following denial of motions to reconsider, Officer appealed pursuant to Supreme Court Rule 307(a)(1) (107 Ill. 2d R. 307(a)(1)). While the appeal was pending, Officer filed with this court a certified copy of a suggestion of death indicating that Jordan died on or about April 23, 1987.

On appeal, this court held that the circuit court erred when it enjoined the holding of the election. We noted that

> "[t]he electors were guaranteed by statute the opportunity to vote for the offices in question on April 7, 1987. (Ill. Rev. Stat. 1985, ch. 46, par. 2A—1.1(b).) The result of this dispute between Democratic party hopefuls has been to prevent electors of political persuasions other than those embraced by the contestants' party from making any expression of their preference at the polls. As a result of the injunction this intraparty squabble has affected the rights of all of the electors." (*Jordan v. Officer* (1987), 155 Ill. App. 3d 874, 877-78, 508 N.E.2d 1077, 1080.)

This court vacated the circuit court's order and remanded the cause for further proceedings.

On May 18, 1987, three days after this court's decision, the circuit court entered its judgment as to the underlying merits of the election contest, finding that 1,217 of 14,757 voters who cast ballots in the 1987 Democratic primary election were ineligible to do so because they had signed nominating petitions for independent candidates. The court declared the Democratic primary election null and void as to the city offices of mayor and treasurer. The court scheduled a new Democratic primary election, for those offices only, for July 14, 1987. The court rescheduled the consolidated election for August 25, 1987.

Defendants Officer and Moore appealed from the circuit court's order. Officer filed a motion in this court to stay the judgment of the circuit court. The motion was granted in a written order entered on June 23, 1987. That order directed the East St. Louis board of election commissioners to hold a consolidated election no later than August 4, 1987. The order further directed that the consolidated election ballot include as nominees those candidates who were successful in the February 24 Democratic primary.

In this appeal, defendants-appellants argue that (1) the election contest should have been dismissed in the trial court for failure to join indispensable parties and (2) plaintiffs waived objections to voter eligibility where they failed to challenge ineligible voters at the polls. In addition, Officer claims that (3) the circuit court lacked subject matter jurisdiction to determine voter eligibility, (4) Jordan's cause of action abated upon his death, and (5) the rule of apportionment of votes should be applied in this case. Further, Moore contends that (6) section 7–43(c) of the Election Code is unconstitutional, (7) courts should not interfere with the electoral process where there is no evidence of fraud or unfairness, (8) the election contest is moot as to the nomination of treasurer, and (9) costs should not have been assessed to defendants.

■ As for the jurisdiction issue, suffice it to say that courts have traditionally exercised their jurisdiction to determine voter eligibility in the course of election contests. (See *Tuthill v. Rendelman* (1944), 387 Ill. 321, 56 N.E.2d 375; *Huber v. Reznick* (1982), 107 Ill. App. 3d 529, 437 N.E.2d 828.) We are aware of no authorities that would deny courts this power, and Officer has not provided persuasive authority in support of his position. We conclude that the circuit court had jurisdiction to determine voter eligibility.

■ A more troublesome question is whether indispensable parties should have been joined. Basic notions of due process require that all parties whose interest will be materially affected be before the court to present their position, and it is error for a court to adjudicate the merits of a cause without jurisdiction of indispensable parties. (*Popovich v. Ram Pipe & Supply Co.* (1979), 74 Ill. App. 3d 343, 392 N.E.2d 954, *affirmed in part and reversed on other grounds* (1980), 82 Ill. 2d 203, 412 N.E.2d 518.) When the court in the case at bar declared that 1,217 ineligible voters had illegally cast ballots, that declaration affected not only the candidates for the offices at issue in the election contest, but also, by implication, the other candidates for other offices. Many ineligible voters must have cast votes for candidates in those races and logically it would seem that the court's decla-

ration should affect the results of those races; therefore, reason would appear to require that the candidates for other offices, successful and unsuccessful, be joined as parties. This is not the law in Illinois.

■ Although all candidates for a particular office must be made parties to an election contest involving that office (*Black v. Termunde* (1973), 14 Ill. App. 3d 937, 303 N.E. 2d 803; *Waupoose v. Kusper* (1972), 8 Ill. App. 3d 668, 290 N.E.2d 903), candidates for an office that is not the subject of the action need not be joined, even though the court's final judgment might, as in this case, cast doubt upon the validity of the results in their races. (See *Hester v. Kamykowski* (1958), 13 Ill. 2d 481, 150 N.E.2d 196.) In *Hester*, a case involving a village election, unsuccessful candidates for the offices of village clerk and police magistrate contested the election result. The court ultimately determined that illegal ballots were used in the election and declared the election void as to the offices of clerk and police magistrate. On appeal, respondents, the successful candidates for those offices, argued, *inter alia*, that necessary parties, *i.e.*, the persons elected president and trustees, were not joined as parties. The Illinois Supreme Court rejected this contention, stating:

> "[R]espondents recognize that the petition does not seek a recount but a declaration that the election was void because of an improper form of ballot. They argue that if the election was void for the offices of village clerk and police magistrate it was also void as to the office of village president, and that the judgment thus affects the interests of persons not made parties to the proceedings. The contention cannot be sustained. The judgment does not purport to affect the election for offices other than clerk and police magistrate, and they are not involved here. *Weeden v. Gher*, 316 Ill. 534, upon which respondents rely, is distinguishable. That case involved an election to an office for which there were three candidates, with two to be elected. One of the candidates was not made a party to the proceedings, although the petition alleged, and the trial court found, that he was legally elected. It was held that since a judgment could not be entered without materially affecting his interests he was a necessary party. No such circumstances are present here. The petition in the case at bar seeks to declare the election void as to the offices of clerk and police magistrate. The interests of persons elected to other offices are not involved." (13 Ill. 2d at 489-90, 150 N.E.2d at 201.)

We are reluctantly compelled to follow *Hester*, given its factual similarity to the case before us. We must hold, therefore, that the candi-

dates for other offices in the municipal election were not indispensable parties.

■ Officer and Moore next contend that the plaintiffs herein waived the right to challenge the eligibility of voters after the election in an election contest, where they failed to utilize the procedures provided in the Election Code for challenging voters at the polls. (Ill. Rev. Stat. 1987, ch. 46, par. 17—9.) Defendants have not persuaded us that waiver is applicable in this context. They cite no cases that so hold.

The *Tuthill* case, cited by plaintiffs, holds to the contrary. In *Tuthill*, the supreme court stated that voting without challenge raises a presumption of a legally cast ballot. That presumption can be overcome by competent evidence. The court in *Tuthill* applied the presumption in determining that a voter (Benjamin Morris) and his wife were eligible to vote in the election at issue. The court stated, "The proof did not overcome the presumption of the validity of their votes cast unchallenged." (*Tuthill*, 387 Ill. at 340, 56 N.E.2d at 385.) Obviously, the supreme court in *Tuthill* did not consider waiver an impediment to consideration of an unchallenged voter's eligibility in an election contest. We can envision situations where neither the election judges nor poll watchers anticipate or recognize a cause for challenge to voter eligibility at the polls and only later discover the impropriety. In this case, apparently no one anticipated that the voters in question would cast ballots at the primary. No lists of signers of independent nominating petitions were available at the polls. It is unreasonable to expect judges or poll watchers to anticipate every cause for challenge. We believe that waiver is inappropriate here.

■ Defendant Moore, relying upon *Tashjian v. Republican Party* (1986), 479 U.S. 208, 93 L. Ed. 2d 514, 107 S. Ct. 544, and *Democratic Party of the United States v. Wisconsin* (1981), 450 U.S. 107, 67 L. Ed. 2d 82, 101 S. Ct. 1010, argues that placing the burden of enforcing section 7—43(c) on State election authorities will "usurp[] the power of the party to determine its own membership." Defendant Moore continues, "The trial court in the present case appears to require the State to do precisely what was prohibited in *Tashjian*—prevents [*sic*] independents from voting in a partisan primary." Defendant has apparently misinterpreted the statute. Section 7—43(c) does not prohibit independents from voting in a party primary; it prevents those *who have signed nominating petitions* for independent candidates from voting in the primary. Moreover, *Tashjian* and *Wisconsin* are factually inapposite.

*Tashjian* and *Wisconsin* generally stand for the proposition that

the party has the right to determine who can participate in its primary elections. In *Tashjian,* for example, a Connecticut statute allowed only party members to vote in a party primary election. One of the State's political parties adopted a rule allowing independents to vote in the primary. The party filed suit against the Secretary of the State of Connecticut, who was charged with the administration of the State's election statutes. On appeal, the United States Supreme Court held that the State's statutory prohibition of the party's voting rule was unconstitutional in that it restricted freedom of association. In *Wisconsin,* the national Democratic party refused to seat State delegates at the national party convention where the delegates had been selected in an "open" primary wherein persons affiliating with other parties or no parties could vote. The United States Supreme Court upheld the national party's right to exclude the State delegates.

In the case at bar the Democratic party had not adopted a rule which would have allowed the ineligible voters to cast ballots in the party's primary. Therefore, we need not address that situation as it has not as yet occurred. We note that our discussion on the constitutionality of the statute, later in this opinion, will address the validity of statutes which restrict a person to nominating only one candidate for one office in the course of the nominating process. Here, our focus is much more limited. We are concerned here only with the question of who will be ultimately responsible for enforcement of the State's election laws. Defendant argues that the candidates should be responsible. We disagree.

■■ ■ It has been held that the State bears the responsibility for providing an orderly election procedure (*Richards v. Lavelle* (N.D. Ill. 1980), 483 F. Supp. 732) and that the State has a compelling interest in preserving the integrity of the election process (*Richards v. Lavelle* (7th Cir. 1980), 620 F. 2d 144). Defendants argue that enforcement of voter qualification statutes would "create burdens impossible for the election apparatus of Illinois to bear." Who is better equipped to oversee elections and enforce compliance with election laws? The resources available to State election authorities surely outweigh those at the command of all but the most affluent candidates. To be sure, the statutes provide for a candidate or party challenge system whereby partisans at the polls monitor the election, but the candidates are not the only parties interested in a fair election. Those who vote also have an interest in seeing an election honestly and fairly conducted. The safeguarding of their interests should not be delegated solely to partisan poll watchers whose motives may not always coincide with the general electorate's. Moreover, it has been held that the State is not

constitutionally required to permit poll watchers for political parties and candidates to observe the conduct of the election. (*Turner v. Cooper* (N.D. Ill. 1983), 583 F. Supp. 1160.) If poll watchers can be excluded from the polling places, the primary duty of enforcing election laws, including those relating to voter qualifications, must reside in the election judges. Election judges do challenge voter qualifications without prompting from partisan poll watchers (see *Huber*, 107 Ill. App. 3d at 542, 437 N.E.2d at 837) and we believe should continue to do so. We believe the primary responsibility for enforcing election laws resides in the election authority and its officials; partisan poll watchers, by means of the challenge system, should perform a watchdog function.

■ Defendant Moore contends that section 7—43(c) of the Election Code is unconstitutional. Section 7—43(c) provides that one signing the petition of an independent candidate cannot later vote in a primary in which candidates for the same office are being selected. We hold that section 7—43(c) is constitutional. The cases cited by the parties support this conclusion.

In *Rouse v. Thompson* (1907), 228 Ill. 522, 81 N.E. 1109, the supreme court held an earlier version of the statute constitutional. In doing so, the court reasoned:

"If the independent voter or the voter affiliating with an opposition party can vote at the primary election of a party with which he has no political affiliation, and thereby control the nominations of a party to which he is opposed and whose candidates he will vote against at the polls, the freedom of the primary election is destroyed. What regulations should be had to secure fair primary elections must rest largely with the legislature, and the courts should not override the discretion placed in that branch of the government by the constitution unless it clearly appears that the constitutional rights of the individual voter have been infringed upon. We are of the opinion that the provisions of the statute above referred to are not subject to constitutional objection." 228 Ill. at 548, 81 N.E. at 1118.

In *American Party of Texas v. White* (1974), 415 U.S. 767, 39 L. Ed. 2d 744, 94 S. Ct. 1296, the Supreme Court considered the constitutionality of a Texas statute that restricted valid signatures on an independent candidate's nominating petition to those of qualified voters who had not signed a petition for another independent candidate for the same office and had not voted at a political party's primary election for the same office. The court upheld the statute, noting that the statutory restriction was "nothing more than a prohibition against

any elector casting more than one vote in the process of nominating candidates for a particular office." (415 U.S. at 785, 39 L. Ed. 2d at 762, 94 S. Ct. at 1308.) The court quoted approvingly from the district court's opinion in *Jackson v. Ogilvie* (N.D. Ill. 1971), 325 F. Supp. 864, 867, *aff'd* (1971), 403 U.S. 925, 29 L. Ed. 2d 705, 91 S. Ct. 2247, which addressed an Illinois statute similar to the Texas statute:

> " 'Thus, the state's scheme attempts to ensure that each qualified elector may in fact exercise the political franchise. He may exercise it either by vote or by signing a nominating petition. He cannot have it both ways.' " *White*, 415 U.S. at 785, 39 L. Ed. 2d at 762, 94 S. Ct. at 1308, quoting from *Jackson*, 325 F. Supp. at 867.

The Illinois statute found to be constitutional in *Jackson* was later upheld in *Stout v. Black* (1972), 8 Ill. App. 3d 167, 289 N.E.2d 456. The Illinois statute, a former version of section 10—4 of the Election Code (Ill. Rev. Stat. 1973, ch. 46, par. 10—4), provided that persons having voted in a preceding primary election were precluded from signing an independent's nominating petition for an office for which candidates were selected at the primary. The *Stout* court, noting that section 7—43 had been held constitutional in *Rouse*, stated:

> "The danger of a non-party member attempting to subvert the party's best candidate while at the same time putting his desired candidate on the ballot exists regardless of whether the primary comes before or after the signing of the petition. Allowing a person to take part in nominating two people for the same office in the same election can only lead to fraud and destruction of party organization. [Citation.]" (8 Ill. App. 3d at 171, 289 N.E.2d at 460.)

Indeed, there is no rational basis for distinguishing between the former section 10—4 and the present section 7—43(c). One is the converse of the other. Section 7—43(c) is constitutional.

■ We now turn to consider defendant Officer's contention that Jordan's cause of action abated upon his death. Section 23—23.1 of the Election Code provides that an election contest shall not abate on account of the death of a contestee. (Ill. Rev. Stat. 1987, ch. 46, par. 23—23.1.) The statute makes no provision for survival of a contestant's cause of action in the event the contestant dies. The legislature could have easily provided for survival of the action upon the death of a contestant, yet it chose not to do so. We interpret the omission as an indication of the legislature's intent that this type of action abate.

■ Moreover, traditional analysis of the abatement issue yields the same result. The determination of whether an action abates or

survives in Illinois is governed by common law rules and statutory provisions changing the common law. Section 27—6 of the Probate Act of 1975 (Ill. Rev. Stat. 1987, ch. 110½, par. 27—6) enumerates those actions which survive death. Election contests are not included in the list. At common law, the distinction between those actions which survived and those which abated upon the death of a party was based upon the type of injury of which the plaintiff complained. If the interest to be protected was primarily a property interest, then the action survived; however, if the interest was primarily personal, the action was held to abate. (*McGill v. Lazzaro* (1978), 62 Ill. App. 3d 151, 153, 379 N.E.2d 16, 18.) A second test widely applied determines whether the right asserted in the action is assignable. If it is not, the action abates. (*Raisl v. Elwood Industries, Inc.* (1985), 134 Ill. App. 3d 170, 479 N.E.2d 1106.) The right to hold office is not a property right; it is personal to the individual. The deceased's estate cannot assume political office; nor can the right to hold office be assigned to another. Therefore, the action must abate as to Jordan.

 Moore claims that the election contest is moot as to the nomination of treasurer because the independent candidate for treasurer, Rouse, who had obtained between 600 and 700 signatures on his nominating papers, withdrew prior to the primary election. Moore argues that only those 600 or 700 persons could have cast illegal ballots for her. We disagree. Rouse's withdrawal had no bearing upon the eligibility of voters who had signed the petitions of independent candidates. Section 7—43(c) states that "[n]o person shall be entitled to vote at a primary" where he or she has "signed the nominating papers of an independent candidate for *any* office for which office candidates for nomination are to be voted for at such primary." (Emphasis added.) (Ill. Rev. Stat. 1987, ch. 46, par. 7—43(c).) Signing a nominating petition for any independent candidate who seeks an office for which party candidates are seeking their party's nomination in the primary election disqualifies the signer from participation in the primary election. The reason for the restriction is simply a matter of enforcement. Once the signer of the independent candidate's petition enters a voting booth in the primary election, it is impossible to ascertain whether he cast a vote for a candidate seeking the same office without compromising the secrecy of the balloting process. The statutory restriction applies to all those who sign an independent candidate's nominating papers whether or not the same office is involved; therefore, the illegal votes are not necessarily limited to between 600 and 700 as Moore argues. All of the illegal votes cast must be taken into account in the resolution of this case.

■■■ We believe that the apportionment of illegal votes between the candidates, on a precinct-by-precinct basis, is appropriate under the circumstances of the case at bar. We find that the circuit court erred where, in the absence of evidence demonstrating fraud or an effort to undermine the nominating process, it nullified the election as to the offices of mayor and treasurer. Of course, given our finding that Jordan's action abated upon his death, we need not address his action further.

As a preliminary matter, we note that Charlotte Moore introduced no evidence of improper ballots, fraud or a concerted attempt to undermine the Democratic party's primary election process for the office of treasurer. There was no evidence that the ineligible voters who cast ballots did so with the intent to subvert the Democratic party's nominating process. Powell's argument assumes that all of the eligible voters cast ballots for Moore. There is no evidence to support that assumption. In fact, the four precincts where the highest numbers of ineligible votes were cast were won by Powell. In precinct No. 15, the precinct with the second highest number of illegal votes, Powell was victorious by a 2 to 1 margin. We do not believe, nor was there evidence, that illegal voting aided one candidate more than another. It is more likely that the voters who signed the petitions circulated on behalf of independent candidates did not even know that by doing so they were forfeiting the opportunity to vote in the primary.

■■■■ ■ Where the legality of votes cast is attacked on grounds not affecting the vote of the entire precinct (*i.e.*, where fraud of the election officials permeating the entire ballot box is not demonstrated), the burden of proving for whom the illegal votes were cast, and that they were sufficient in number to change the results of the election, falls upon the contestant. Where the contestant fails to meet that burden, his petition fails. (*Gibson v. Kankakee School District 111* (1975), 34 Ill. App. 3d 948, 341 N.E.2d 447.) Where there are numerous irregularities involved in an election that affect the entire vote, such as irregularities as to the form of ballot, the election must be voided. (*Hester v. Kamykowski* (1958), 13 Ill. 2d 481; *Pinkston v. Holland* (1971), 133 Ill. App. 2d 865, 272 N.E.2d 247.) Similarly an election must be voided where serious impropriety occurs in the voting and it is impossible to obtain "an accurate calculation of the valid and invalid votes." (*Drolet v. Stentz* (1967), 83 Ill. App. 2d 202, 207, 227 N.E.2d 114, 117.) However, where the portion of the vote containing illegal ballots can be identified with certainty, and proof of irregularities in voting is not such as to justify a disenfranchisement of all voters in the precinct involved, it is proper to apportion the illegal

ballots and surcharge the votes in the precinct accordingly instead of excluding the entire vote. (*Webb v. Benton Consolidated High School District No. 103* (1970), 130 Ill. App. 2d 824, 264 N.E.2d 415.) Illegal votes must be apportioned between the two candidates in a ratio of each candidate's vote at a given precinct polling place to the total vote cast at that place. (*Frese v. Camferdam* (1979), 76 Ill. App. 3d 68, 394 N.E.2d 845.) The total of each candidate is reduced by the resulting amount. *Smoda v. Gallagher* (1952), 412 Ill. 271, 106 N.E.2d 181.

The circuit court calculated the number of illegal votes to be 1,217 of 14,757 votes cast, approximately 8.24% of the votes cast in the Democratic party primary. We calculate 1,215 illegal votes, using the circuit court's statistics. We believe the discrepancy is *de minimus* and we base calculations appearing hereafter on the 1,215 figure.

| Precinct No. | Illegal Votes | Total Precinct Votes | Powell | Powell Apportioned vote reductions | Moore | Moore Apportioned vote reductions |
|---|---|---|---|---|---|---|
| 1 | 26 | 274 | 101 | 9.58 | 173 | 16.41 |
| 2 | 21 | 214 | 98 | 9.61 | 116 | 11.38 |
| 3 | 24 | 177 | 58 | 7.86 | 119 | 16.13 |
| 4 | 8 | 121 | 68 | 4.49 | 53 | 3.50 |
| 5 | 27 | 227 | 93 | 11.05 | 134 | 15.93 |
| 6 | 23 | 333 | 284 | 19.61 | 49 | 3.38 |
| 7 | 16 | 118 | 56 | 7.59 | 62 | 8.40 |
| 8 | 6 | 103 | 48 | 2.79 | 55 | 3.20 |
| 9 | 16 | 309 | 133 | 6.88 | 176 | 9.11 |
| 11 | 20 | 315 | 203 | 12.88 | 112 | 7.11 |
| 12 | 5 | 182 | 134 | 3.68 | 48 | 1.31 |
| 13 | 13 | 238 | 82 | 4.47 | 156 | 8.52 |
| 14 | 27 | 258 | 85 | 8.89 | 173 | 18.10 |
| 15 | 57 | 204 | 133 | 37.15 | 71 | 19.83 |
| 17 | 18 | 237 | 112 | 8.50 | 125 | 9.49 |
| 18 | 16 | 223 | 112 | 8.03 | 111 | 7.96 |
| 19 | 19 | 288 | 152 | 10.02 | 136 | 8.97 |
| 20 | 44 | 159 | 81 | 22.41 | 78 | 21.58 |
| 21 | 43 | 323 | 149 | 19.83 | 174 | 23.15 |
| 22 | 68 | 274 | 144 | 35.73 | 130 | 32.25 |
| 23 | 11 | 176 | 131 | 8.18 | 45 | 2.81 |
| 24 | 9 | 157 | 90 | 5.15 | 67 | 3.84 |

| Precinct No. | Illegal Votes | Total Precinct Votes | Powell | Powell Apportioned vote reductions | Moore | Moore Apportioned vote reductions |
|---|---|---|---|---|---|---|
| 25 | 24 | 300 | 154 | 12.31 | 146 | 11.67 |
| 26 | 15 | 227 | 154 | 10.17 | 73 | 4.82 |
| 27 | 32 | 295 | 126 | 13.66 | 169 | 18.32 |
| 28 | 25 | 270 | 67 | 6.20 | 203 | 18.79 |
| 29 | 9 | 184 | 101 | 4.94 | 83 | 4.05 |
| 30 | 30 | 233 | 99 | 12.74 | 134 | 17.25 |
| 31 | 36 | 362 | 121 | 12.03 | 241 | 23.96 |
| 32 | 25 | 324 | 145 | 11.18 | 179 | 13.81 |
| 33 | 16 | 251 | 128 | 8.15 | 123 | 7.84 |
| 34 | 40 | 441 | 123 | 11.15 | 318 | 28.84 |
| 35 | 21 | 288 | 134 | 9.76 | 254 | 11.22 |
| 36 | 43 | 474 | 197 | 17.87 | 277 | 25.12 |
| 37 | 1 | 180 | 150 | .83 | 30 | .16 |
| 38 | 18 | 243 | 71 | 5.25 | 172 | 12.74 |
| 39 | 4 | 120 | 66 | 2.20 | 54 | 1.80 |
| 40 | 20 | 191 | 55 | 5.75 | 136 | 14.24 |
| 41 | 24 | 187 | 100 | 12.83 | 87 | 11.16 |
| 42 | 7 | 171 | 122 | 4.99 | 49 | 2.00 |
| 43 | 33 | 286 | 96 | 11.07 | 190 | 21.92 |
| 44 | 12 | 338 | 169 | 6.00 | 169 | 6.00 |
| 45 | 44 | 279 | 144 | 22.70 | 135 | 21.28 |
| 46 | 6 | 275 | 118 | 2.57 | 157 | 3.42 |
| 47 | 34 | 276 | 156 | 19.21 | 120 | 14.77 |
| 48 | 18 | 314 | 104 | 5.96 | 210 | 12.03 |
| 49 | 40 | 325 | 131 | 16.12 | 194 | 23.87 |
| 50 | 38 | 269 | 115 | 16.24 | 154 | 21.75 |
| 51 | 33 | 424 | 163 | 12.68 | 261 | 20.31 |
| 52 | 38 | 394 | 76 | 7.32 | 318 | 30.66 |
| UK | 12 | 12 | | 6.00 | | 6.00 |
| Totals | 1,215 | 12,831 | 5,932 | 552.26 | 6,899 | 662.16 |

Apportioning the votes in each precinct between the candidates and dividing equally between them the vote tally designated "UK" (presumably unknown precinct) in the circuit court, we find that

Powell's total vote should be reduced by approximately 552.26 votes and Moore's vote should be reduced by approximately 662.16, thus leaving Powell with 5,379.74 and Moore with 6,236.84. Moore would still win by a considerable margin.

■■ Finally, defendant Moore claims that costs should not have been assessed against defendants. Defendant fails to present any elucidating discussion and she cites no authority in support of her contention. This court is not compelled by case law or court rule to research the case for appellant. (*Dorsey v. Ryan* (1982), 110 Ill. App. 3d 577, 442 N.E.2d 689; *Nicholl v. Scaletta* (1982), 104 Ill. App. 3d 642, 432 N.E.2d 1267; 113 Ill. 2d R. 341(e)(7).) We choose not to do so.

For the foregoing reasons the judgment of the circuit court of St. Clair County is reversed.

Reversed.

HARRISON, P.J., and WELCH, J., concur.